THOMAS, Circuit Judge.
 

 This appeal presents the question of whether, and under what circumstances, a tribal court tort judgment is entitled to recognition in the United States Courts. We conclude that the principles of comity, not fell faith and credit, govern whether a district court should recognize and enforce a tribal court judgment. In this instance, because the tribal court lacked jurisdiction, its judgment is not entitled to recognition in the United States courts.
 

 I
 

 The traffic accident which precipitated this action involved Mary Jane Wilson, who is an enrolled member of the Blackfeet Indian Tribe, and Thomas Marchington, who is not. On July 17, 1989, Marchington was driving on U.S. Highway 2 within the boundaries of the Blackfeet Indian Reservation in Montana on assignment for his employer Inland Empire Shows, an Idaho carnival company. Wilson, driving ahead of Marchington on the two-lane road, signalled a left turn. March-ington, in ignorance or in disregard of Wilson’s intent, attempted to pass her on the left, careening into her car as she exited Highway 2.
 

 Wilson sued Marchington and Inland Empire in the Blackfeet Tribal Court. The tribal jury found in favor of Wilson and awarded her $246,100. The Blackfeet Court of Appeals reversed for a hearing on whether punitive damages had been improperly awarded, but the Blackfeet Supreme Court reversed the Blackfeet Court of Appeals and reinstated the original judgment in favor of Wilson.
 

 Claiming her judgment was entitled to fell faith and credit or comity, Wilson brought suit in the United States District Court for the District of Montana to register the tribal court judgment in the federal court system. The district court granted summary judgment in favor of Wilson.
 

 II
 

 No legal judgment has any effect, of its own force, beyond the limits of the sovereignty from which its authority is derived. Because states and Indian tribes coexist as sovereign governments, they have no direct power to enforce their judgments in each other’s jurisdictions. By contrast, the United States Constitution and implementing legislation require fell faith and credit be given to judgments of sister states, territories, and possessions of the United States. U.S.
 
 *808
 
 Const, art. IV, § I, cl. 1; 28 U.S.C. § 1738. The extent to which the United States, or any state, honors the judicial decrees of foreign nations is a matter of choice, governed by “the comity of nations.”
 
 Hilton v. Guyot, 159
 
 U.S. 113, 163, 16 S.Ct. 139, 143, 40 L.Ed. 95(1895).
 

 Determining comity to be a proper basis for recognizing a tribal court judgment is not a remarkable notion; indeed, both parties agree that it is appropriate. However, Wilson asserts comity only as an alternative analysis, contending that a tribal judgment must be recognized by the United States under 28 U.S.C. § 1738, the implementing legislation of the United States Constitution’s Full Faith and Credit Clause.
 

 The Constitution’s Full Faith and Credit Clause provides:
 

 Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof
 

 U.S. Const, art. IV, § 1.
 

 By its terms, the Full Faith and Credit j Clause applies only to the states. Nothing in debates of the Constitutional Convention conj cerning the clause indicates the framers j thought the clause would apply to Indian j tribes. The Constitution is silent about ree-Iognition of tribal judgments, though it specifically addresses other tribal concerns.
 
 See
 
 U.S. Const, art. I, § 2, cl. 3 (excluding non-taxed Indians from the calculation of repre-Isentative apportionment); art. I, § 8, cl. 3 (providing Congress the power to regulate commerce with the Indian tribes); amend. XIV, § 2 (excluding non-taxed Indians from ! the calculation of representative apportionment).
 
 [1]
 
 Thus, the Constitution itself does not afford Ml faith and credit to Indian tribal judgments.
 

 Initial legislation implementing the full faith and credit clause was passed in 1790. The statute was modified in 1804 to include the extension of full faith and credit to United States territories and possessions. Subsequent technical amendments were made and the current full faith and credit statute reads in relevant part:
 

 Such Acts, records, and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.
 

 28 U.S.C. § 1738.
 

 Because Indian nations are not referenced in the statute, the question is whether tribes are “territories or possessions” of the United States under the statute. The United States Supreme Court has not ruled on the precise issue and its pronouncements on collateral matters are inconclusive. For example, in
 
 United States ex rel. Mackey v. Coxe,
 
 59 U.S. (18 How.) 100, 103-04, 15 L.Ed. 299 (1855), the Court held the Cherokee nation was a territory as that term was used in a federal letters of administration statute. By contrast, in
 
 New York ex rel. Kopel v. Bingham,
 
 211 U.S. 468, 474-75, 29 S.Ct. 190, 191-92, 53 L.Ed. 286 (1909), the Court cited with approval
 
 Ex Parte Morgan,
 
 20 F. 298, 305 (W.D.Ark.1883) in which the district court held that the Cherokee nation was not a “territory” under the federal extradition statute. State courts have reached varied results, citing either
 
 Mackey or Morgan
 
 as authority, depending on the outcome.
 
 [2]
 

 In our view, the decisive factor in determining Congress’s intent was the enactment
 
 *809
 
 of subsequent statutes which expressly extended foil faith and credit to certain tribal proceedings: the Indian Land Consolidation Act, 25 U.S.C. §§ 2201-2211 (1988) (extending full faith and credit for certain actions involving trust, restricted or controlled lands), the Maine Indian Claims Settlement Act, 25 U.S.C. § 1725(g) (1980) (requiring the Passamaquoddy Tribe, the Penobscot Nation and the State of Maine to “give full faith and credit to the judicial proceedings of each other”), and the Indian Child Welfare Act of 1978, 25 U.S.C. §§ 1901
 
 et seq.
 
 (extending full faith and credit to tribal custody proceedings). The Indian Child Welfare Act provides in relevant part:
 

 The United States, every State, every territory or possession of the United States, and every Indian tribe shall give full faith and credit to the public acts, records, and judicial proceedings of any Indian tribe applicable to Indian child custody proceedings to the same extent that such entities give full faith and credit to the publie acts, records, and judicial proceedings of any other entity.
 

 Id.
 
 § 1911(d).
 

 A later legislative act can be regarded as a legislative interpretation of an earlier act and “is therefore entitled to great weight in resolving any ambiguities and doubts.”
 
 Erlenbaugh v. United States,
 
 409 U.S. 239, 243-44, 93 S.Ct. 477, 480, 34 L.Ed.2d 446 (1972) (quoting
 
 United States v. Stewart,
 
 311 U.S. 60, 64-65, 61 S.Ct. 102, 105, 85 L.Ed. 40 (1940)). If full faith and credit had already been extended to Indian tribes, enactment of the Indian Land Consolidation Act, the Maine Indian Claims Settlement Act, and the Indian Child Welfare Act would not have been necessary. Further, the separate listing of territories, possessions and Indian tribes in the Indian Child Welfare Act provides an indication that Congress did not view these terms as synonymous. Thus, we conclude that Congress did not extend full faith and credit to the tribes under 28 U.S.C. § 1738.
 

 Further, if Congress had specifically intended to include Indian tribes under the umbrella of 28 U.S.C. § 1738, it could have easily done so either by specifically referencing them in the 1804 amendments, or by further amending the statute once ambiguous judicial constructions appeared. It chose not to, but rather elected to create a special exception in cases of Indian child custody determinations and land trusts.
 

 Given this history, it would be imprudent of us to now construe the phrase “territories and possessions” in the 1804 statute to assume the meaning of the language Congress used in the Indian Child Welfare Act (“every territory or possession of the United States,
 
 and every Indian tribe
 
 ”) (emphasis added) and Indian Land Consolidation Act.
 

 Certainly, there are policy reasons which could support an extension of full faith and credit to Indian tribes. Those decisions, however, are within the province of Congress or the states,
 
 [3]
 
 not this Court. Full faith and credit is not extended to tribal judgments by the Constitution or Congressional act, and we decline to extend it judicially.
 

 Ill
 

 In absence of a Congressional extension of full faith and credit, the recognition and enforcement of tribal judgments in federal court must inevitably rest on the principles of comity. Comity “is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other.”
 
 Hilton v. Guyot,
 
 159 U.S. 113, 163-64, 16 S.Ct. 139, 143-44, 40 L.Ed. 95 (1895). As a general policy, “[cjomity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect.”
 
 Somportex Ltd. v. Philadelphia Chewing Gum Corp.,
 
 453 F.2d 435, 440 (3d Cir.1971). At its core,
 
 *810
 
 comity involves a balancing of interests. “[I]t is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own eitizens, or of other persons who are under the protection of its laws.”
 
 Hilton,
 
 159 U.S. at 164, 16 S.Ct. at 143. Although the status of Indian tribes as “dependent domestic nations” presents some unique circumstances, comity still affords the best general analytical framework for recognizing tribal judgments.
 

 As we recognized in
 
 Her Majesty the Queen v. Gilbertson,
 
 597 F.2d 1161, 1163 n. 4 (9th Cir.1979),
 
 Hilton
 
 provides the guiding principles of comity.
 
 [4]
 
 More recently, the Restatement (Third) of Foreign Relations Law of the United States (1986) [hereinafter Restatement (Third) ] suggested two mandatory and six discretionary grounds for nonrecognition of foreign judgments.
 
 [5]
 
 While
 
 Hilton
 
 and the Restatement (Third) provide sound guidance for assessing legal judgments of other nations, special considerations arising out of existing Indian law merit some modification in the application of comity to tribal judgments. In synthesizing the traditional elements of comity with the special requirements of Indian law, we conclude that, as a general principle, federal courts should recognize and enforce tribal judgments. However, federal courts must neither recognize nor enforce tribal judgments if:
 

 (1) the tribal court did not have both personal and subject matter jurisdiction; or
 

 (2) the defendant was not afforded due process of law.
 

 In addition, a federal eourt may, in its discretion, decline to recognize and enforce a tribal judgment on equitable grounds, including the following circumstances:
 

 (1) the judgment was obtained by fraud;
 

 (2) the judgment conflicts with another final judgment that is entitled to recognition;
 

 (3) the judgment is inconsistent with the parties’ contractual choice of forum; or
 

 (4) recognition of the judgment, or the cause of action upon which it is based, is against the public policy of the United States or the forum state in which recognition of the judgment is sought.
 

 The lack of personal jurisdiction mandates rejection of a foreign judgment under
 
 *811
 
 the Restatement (Third) and that requirement must logically extend to tribal judgments. Although the Restatement (Third) lists subject matter jurisdiction as a discretionary inquiry, the existence of subject matter jurisdiction is a threshold inquiry in virtually every federal examination of a tribal judgment.
 
 E.g., Strate v. A-1 Contractors,
 
 — U.S. -, -, 117 S.Ct. 1404, 1411,137 L.Ed.2d 661 (1997);
 
 Montana v. United States,
 
 450 U.S. 544, 565-66, 101 S.Ct. 1245, 1258-59, 67 L.Ed.2d 493 (1981). Additionally, the existence of subject matter jurisdiction is mandatory under the Uniform Foreign Money-Judgments Recognition Act which has been adopted by twenty-five states, including Montana. Louise E. Teitz, Transnational Litigation 253 & n. 5 (1996); Mont.Code Ann. § 25-9-601
 
 et seq.
 
 Accordingly, the existence of both personal and subject matter jurisdiction is a necessary predicate for federal court recognition and enforcement of a tribal judgment.
 

 A federal court must also reject a tribal judgment if the defendant was not afforded due process of law. “It has long been the law of the United State that a foreign judgment cannot be enforced if it was obtained in a manner that did not accord with the basics of due process.”
 
 Bank Melli Iran v. Pahlavi,
 
 58 F.3d 1406, 1410 (9th Cir.),
 
 cert. denied,
 
 - U.S. -, 116 S.Ct. 519, 133 L.Ed.2d 427 (1995). The guarantees of due process are vital to our system of democracy. We demand that foreign nations afford United States citizens due process of law before recognizing foreign judgments; we must ask no less of Native American tribes.
 

 Due process, as that term is employed in comity, encompasses most of the
 
 Hilton
 
 factors, namely that there has been opportunity for a full and fair trial before an impartial tribunal that conducts the trial upon regular proceedings after proper service or voluntary appearance of the defendant, and that there is no showing of prejudice in the tribal court or in the system of governing laws. Further, as the Restatement (Third) noted, evidence “that the judiciary was dominated by the
 
 political
 
 branches of government or by an opposing litigant, or that a party was unable to obtain counsel, to secure documents or attendance of witnesses, or to have access to appeal or review, would support a conclusion that the legal system was one whose judgments are not entitled to recognition.” Restatement (Third) § 482 cmt. b.
 

 Comity does not require that a tribe utilize judicial procedures identical to those used in the United States Courts. “Foreign-law notions are not per se disharmonious with due process by reason of their divergence from the common-law notions of procedure.”
 
 Panama Processes, S.A. v. Cities Serv. Co.,
 
 796 P.2d 276, 286 n. 36 (Okla.1990). Indeed,
 
 Hilton
 
 rejected challenges to a judgment based on lack of adequate cross-examination and unsworn testimony. 159 U.S. at 205, 16 S.Ct. at 159. Federal courts must also be careful to respect tribal jurisprudence along with the special customs and practical limitations of tribal court systems. Extending comity to tribal judgments is not an invitation for the federal courts to exercise unnecessary judicial paternalism in derogation of tribal self-governance. However, the tribal court proceedings must afford the defendant the basic tenets of due process or the judgment will not be recognized by the United States.
 

 Marehington urges us to require reciprocal recognition of judgments as an additional mandatory prerequisite. In
 
 Hilton,
 
 the Supreme Court determined that a judgment from a foreign country would not be enforced by the United States courts if the foreign country would not enforce a similar American judgment in its courts. 159 U.S. at 210, 16 S.Ct. at 161. However, the reciprocity requirement has fallen into disfavor. In
 
 Banco Nacional de Cuba v. Sabbatino,
 
 376 U.S. 398, 84 S.Ct. 923,11 L.Ed.2d 804 (1964), the Supreme Court stated, “[although
 
 Hilton v. Guyot ...
 
 contains some broad language about the relationship of reciprocity to comity, the case in fact imposed a requirement of reciprocity only in regard to eonelu-siveness of judgments, and even then only in limited circumstances.”
 
 Id.
 
 at 411, 84 S.Ct. at 931. According to the Restatement (Second) of Conflict of Laws (1988) [hereinafter Restatement (Second) ], “[ejxcept when otherwise required by local statute, the great majority of State and federal courts have
 
 *812
 
 extended recognition to judgments of foreign nations without regard to any question of reciprocity.” § 98 cmt. f. The Restatement (Second) addresses the
 
 Hilton
 
 problem by noting that the decision involved “one isolated situation,” and suggesting that
 
 Hilton
 
 be limited to its facts.
 
 Id.
 
 Additionally, Judge Learned Hand has observed that the Supreme Court “certainly did not mean to hold that an American court was to recognize no obligations or duties arising elsewhere until it appeared that the sovereign of the locus reciprocally recognized similar obligations existing here. That doctrine I am happy to say is not a part of American jurisprudence.”
 
 Direction der Disconto-Gesellschaft v. United States Steel Corp.,
 
 300 F. 741, 747 (S.D.N.Y.1924),
 
 aff'd,
 
 267 U.S. 22, 45 S.Ct. 207, 69 L.Ed. 495 (1925);
 
 see Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB,
 
 773 F.2d 452, 460 (2d Cir.1985).
 

 Although courts have expressed disaffection for the reciprocity requirement, they have not entirely disavowed it. For example, in
 
 Gilbertson, we
 
 recognized that “the reciprocity i*equirement has fallen into some disfavor,” 597 F.2d at 1164 n. 6, and agreed that “reciprocity may no longer be a requirement,”
 
 id.
 
 at 1165-66. However, we also noted that reciprocity “certainly remains a factor which may be considered in deciding whether to recognize a foreign country’s judgment for taxes.”
 
 Id.
 
 at 1166.
 

 The general rationale underlying rejection of the reciprocity requirement is that it is a matter of diplomacy, best negotiated by the executive and legislative branches. There are, of course, substantive differences between foreign relations with other nations and domestic relations with Native American tribes. Further, a policy of requiring reciprocity with foreign nations has practical limits which would not affect a domestic analysis. If a litigant sought recognition of a Djibouti judgment in Montana, for example, it is unlikely that Djibouti would have had the prior opportunity to consider recognition of a Montana judgment.
 

 Despite these dissimilarities, the theory that the imposition of a reciprocity requirement is not a matter for courts to decide independently is generally sound. The question of whether a reciprocity requirement ought to be imposed on an Indian tribe before its judgments may be recognized is essentially a public policy question best left to the executive and legislative branches. The fact that some states have chosen to impose such a condition by statute reinforces this conclusion,
 
 [6]
 
 as does the judicial response of looking to applicable statutes to decide reciprocity issues.
 
 See, e.g., Banque Libanaise Pour. Le Commerce v. Khreich,
 
 915 F.2d 1000, 1003-04 (5th Cir.1990) (examining the Texas Recognition Act to determine if an Abu Dahbi judgment should be enforced).
 

 Neither the State of Montana nor, more relevantly, Congress has spoken on this question and we do not believe that
 
 Hilton
 
 or any controlling case law concerning recognition of foreign judgments requires a district court to reject a tribal judgment for lack of reciprocity. Thus, we decline Marehington’s suggestion to adopt reciprocity as a judicially-created mandatory requirement.
 
 [7]
 

 Lack of tribal jurisdiction and absence of due process, then, are the only mandatory reasons for a district court to reject a tribal judgment. The court may, in the exercise of
 
 *813
 
 its discretion, choose not to honor a tribal judgment for one of the other enumerated reasons. This approach satisfies two competing concerns: it provides tribes with a mechanism by which the judgments of their courts may be recognized by the United States while assuring defendants of due process of law and other safeguards inherent in our judicial system.
 

 IV
 

 We reject the assertions of March-ington and several Amicus Curiae that the recognition of tribal judgments requires the application of state, rather than federal, law. We apply federal common law when a federal rule of decision is “necessary to protect uniquely federal interests.”
 
 Banco Nacional de Cuba v. Sabbatino,
 
 376 U.S. 398, 426, 84 S.Ct. 923, 939, 11 L.Ed.2d 804 (1964). Indian law is uniquely federal in nature, having been drawn from the Constitution, treaties, legislation, and an “intricate web of judicially made Indian law.”
 
 Oliphant v. Suquamish Indian Tribe,
 
 435 U.S. 191, 206, 98 S.Ct. 1011, 1020, 55 L.Ed.2d 209 (1978). State law, especially the compacts between a state and a tribe, may be of substantial significance in a particular case. However, the quintessentially federal character of Native American law, coupled with the imperative of consistency in federal recognition of tribal court judgments, by necessity require that the ultimate decision governing the recognition and enforcement of a tribal judgment by the United States be founded on federal law.
 
 Chilkat Indian Village v. Johnson,
 
 870 F.2d 1469, 1473 (9th Cir.1989);
 
 see also In re Greene,
 
 980 F.2d 590, 595 (9th Cir.1992) (“[T]he [district] court should have looked at the scope of tribal immunity under federal law, rather than the extent of comity afforded under state law.”).
 

 V
 

 Applying the comity analysis to this case, we find that the tribal judgment is not entitled to recognition or enforcement because the tribal court lacked subject matter jurisdiction, one of the mandatory reasons for refusing to recognize a tribal court judgment. Our jurisdictional determination is commanded by
 
 Strate v. A-1 Contractors,
 
 — U.S. -, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997), decided April 28,1997.
 

 The Supreme Court’s holding in
 
 Strate
 
 is succinctly stated in its opening paragraphs: “[T]ribal courts may not entertain claims against nonmembers arising out of accidents on state highways, absent a statute or treaty authorizing the tribe to govern the conduct of nonmembers on the highway in question.”
 
 Id.
 
 at --, 117 S.Ct. at 1408.
 

 The Supreme Court analyzed the North Dakota highway at issue in
 
 Strate,
 
 and concluded that “[t]he right-of-way North Dakota acquired for the State’s highway renders the 6.59-mile stretch equivalent, for nonmember governance purposes, to alienated, non-Indian land.”
 
 Id.
 
 at -, 117 S.Ct. at 1413 (footnote omitted). To arrive at this conclusion, the Supreme Court made the following observations about the highway right-of-way: (1) the right-of-way was obtained pursuant to congressional legislation; (2) the grant of the right-of-way was acquired with the consent of the Indian tribe; (3) the right-of-way is open to the public; and (4) the right-of-way is controlled and maintained by the State.
 
 Id.
 
 at-, 117 S.Ct. at 1414.
 

 U.S. Highway 2, the road at issue in this appeal, is similar in all relevant respects to the highway in
 
 Strate.
 
 It is located on a right-of-way granted to the State of Montana under Section 4 of the Act of March 3, 1901, ch. 832, 31 Stat. 1058, 1084 (codified at 25 U.S.C. § 311). Under the section, the Secretary of the Interior is authorized
 

 to grant permission ... to the proper State or local authorities for the opening and establishment of public highways in accordance with the laws of the State or territory in which the lands are situated, through any Indian reservation or through any lands which have been allotted in sev-eralty to any individual Indians under laws or treaties but which have not been conveyed to the allottees with full power of alienation.
 

 See also
 
 Act of March 4, 1915, ch. 161, § 2, 38 Stat. 1188 (“That the legal authorities charged with the duty of laying out and opening public roads and highways under the
 
 *814
 
 laws of the State of Montana, having jurisdiction over any territory embraced within any Indian reservation in Montana, are hereby authorized and empowered to lay out and open public roads within any of the said Indian reservations-”). Therefore, like the highway at issue in
 
 Strate,
 
 Highway 2 is a state highway constructed on a right-of-way granted pursuant to a federal statute.
 

 Also similar to the situation in
 
 Strate,
 
 the tribe had consented to the right-of-way grant. Under the Treaty of 1855 with the Blaekfeet Nation, the tribe agreed:
 

 For the purpose of establishing travelling thoroughfares through their country, and the better to enable the President to execute the provisions of this treaty, the aforesaid nations and tribes do hereby consent and agree and the United States may, within the countries respective occupied and claimed by them, construct roads of every description....
 

 Treaty with the Blaekfeet Nation, October 17, 1855, U.S.-Blackfeet Nation, art. 8, 11 Stat. 867.
 

 Finally, also as in
 
 Strate,
 
 the district court found, and no party or Amici denies, that the public has unrestricted access to Highway 2.
 

 Thus, this case mirrors the facts of
 
 Strate
 
 almost precisely: it was an automobile accident between two individuals on a United States highway designed, built, and maintained by the State of Montana, with no statute or treaty authorizing the tribe to govern the- conduct of nonmembers on the highway. The tribe had consented to construction of the road to which the general public had unrestricted access.
 

 The question of whether the accident occurred on, or just off, Highway 2 is disputed by the parties. The district court, however, determined that the accident occurred on Highway 2, and we review' this finding only for clear error.
 
 Campbell v. Wood,
 
 18 F.3d 662, 681 (9th Cir.1994) (en banc). There are faets in the record which support the district court’s conclusion. The accident occurred while Marehington was trying to pass Wilson who, presumably unknown to Marehington, was turning left. Wilson’s car apparently was struck in the side. Wilson argues the impact may have occurred just off Highway 2 because the truck was trying to avoid Wilson by driving on the left. However, both parties agreed that the State of Montana’s right-of-way did not end at the pavement and could have extended up to fifty feet from the center line. We also note that the description of the accident by the Blaekfeet Supreme Court would seem to support the inference that the accident occurred on Highway 2.
 
 [8]
 
 Given these facts, there was no clear error in the district court’s determination.
 

 In
 
 Strate,
 
 the Supreme Court noted that even when the accident oeeurs on alienated land, a tort action may be brought in tribal court if one of the two following exceptions outlined in
 
 Montana v. United States,
 
 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), is met: (1) regulation of consensual relationships and (2) regulation of conduct which “threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.”
 
 Montana,
 
 450 U.S. at 566, 101 S.Ct. at 1258. The Supreme Court concluded in
 
 Strate,
 
 however, that a ear accident on a public highway does not meet either
 
 Montana
 
 exception.
 
 Strate,
 
 — U.S. at -, -, 117 S.Ct. at 1415, 1416,
 

 Wilson and several Amici elaim that a traffic accident injuring a tribal member sufficiently affects the economic security, political integrity, or health and welfare of the tribe, thus satisfying the second
 
 Montana
 
 exception. However, in
 
 Strate,
 
 this notion was rejected by Justice Ginsburg, speaking for the Court, who observed that:
 

 Undoubtedly, those who drive carelessly on a public highway running through a reservation endanger all in the vicinity, and surely jeopardize the safety of tribal members. But if Montana’s seeond exception requires no more, the exception would severely shrink the rule.
 

 
 *815
 

 Id.,
 
 — U.S. at —, 117 S.Ct. at 1415. If the possibility of injuring multiple tribal members does not satisfy the second
 
 Montana
 
 exception under
 
 Strate,
 
 then,
 
 perforce,
 
 Wilson’s status as a tribal member alone cannot.
 
 [9]
 
 To invoke the second
 
 Montana
 
 exception, the impact must be “demonstrably serious and must imperil the political integrity, the economic security, or the health and welfare of the Tribe.”
 
 Brendale v. Confederated Tribes & Bands of the Yakima, Indian Nation,
 
 492 U.S. 408, 431, 109 S.Ct. 2994, 3008, 106 L.Ed.2d 343 (1989). It is difficult to argue that these important interests will be diminished, much less jeopardized, if Wilson must present her individual tort claims in state or federal court, where she has plain, speedy, and adequate remedies.
 
 [10]
 
 As Justice Ginsburg observed, “[njeither regulatory nor adjudicatory authority over the state highway accident at issue is needed to preserve the right of reservation Indians to make their own laws and be ruled by them.... Opening the Tribal Court for [the plaintiffs] optional use is not necessary to protect tribal self government[.]” Strate, - U.S. at -, 117 S.Ct. at 1416 (internal quotation omitted). Thus, although the parameters of the
 
 Strate
 
 holding are not fully defined, its application to the specific circumstances of this case precludes tribal court jurisdiction.
 

 Finally, the Blackfeet Tribe (as Amieus Curiae), contends that
 
 Hinshaw v. Mahler,
 
 42 F.3d 1178 (9th Cir.1994), which found tribal jurisdiction in an automobile accident, controls. However,
 
 Hinshaw
 
 has been effectively overruled by
 
 Strate
 
 for its general propositions concerning tribal jurisdiction and is no longer viable law on those issues.
 

 VI
 

 The principles of comity require that a tribal court have competent jurisdiction before its judgment will be recognized by the United States courts. Because the tribal court did not have subject matter jurisdiction over Marchington or Inland Empire Shows, Inc., Wilson’s judgment may neither be recognized nor enforced in the United States courts. The district court foresaw this very result, but constrained by
 
 Hinshaw,
 
 entered summary judgment in favor of Wilson. Ironically, although the district court was correct and even prescient on all substantive matters, we must reverse its judgment in favor of Wilson and remand with instructions to enter judgment in favor of Marchington and Inland Empire Shows. Each party shall bear its own costs on appeal.
 

 REVERSED AND REMANDED
 

 [1]
 

 . Additionally, as a matter of constitutional philosophy, it may not make sense to extend the constitutional mandate of full faith and credit "to a legal system largely outside the purview of the Constitution." Note,
 
 Recognition of Tribal Decisions in State Courts,
 
 37 Stan. L.Rev. 1397, 1414 (1985).
 

 [2]
 

 . Compare Jim v. CIT Fin. Servs.,
 
 87 N.M. 362, 533 P.2d 751 (1975) (citing
 
 Mackey
 
 and holding that tribes are entitled to full faith and credit) and
 
 In re Buehl,
 
 87 Wash.2d 649, 555 P.2d 1334 (1976) (citing
 
 CIT
 
 and concluding that tribes are entitled to full, faith and credit)
 
 with Brown v. Babbitt Ford, Inc.,
 
 117 Ariz. 192, 571 P.2d 689 (1977) (citing
 
 Morgan
 
 and holding that an Indian reservation is not a territory for purposes of full faith and credit).
 

 [3]
 

 .
 
 See, e.g.,
 
 Okla. Stat. tit. 12, § 728 (permitting the Supreme Court of the State of Oklahoma to extend full faith and credit to tribal court judgments); Wis. Stat. § 806.245 (granting full faith and credit to judgments of Wisconsin Indian tribal courts); Wyo. Stat. Ann. § 5-1-111 (granting full faith and credit to judicial decisions of the Eastern Shoshone and Northern Arapaho Tribes of the Wind River Reservation). Montana has judicially refused to extend full faith and credit to tribal orders, judgments and decrees.
 
 In re Day,
 
 272 Mont. 170, 900 P.2d 296, 301 (1995).
 

 [4]
 

 . [W]here there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact.
 

 Hilton,
 
 159 U.S. at 202-03, 16 S.Ct. at 158.
 

 [5]
 

 . The Restatement (Third) § 482 provides:
 

 (1) A court in the United States may not recognize a judgment of the court of a foreign state if:
 

 (a)the judgment was rendered under a judicial system that does not provide impartial tribunals or procedures compatible with due process of law; or
 

 (b)the court that rendered the judgment did not have jurisdiction over the defendant in accordance with the law of the rendering state and with the rules set forth in § 421.
 

 (2) A court in the United States need not recognize a judgment of the court of a foreign state if:
 

 (a) the court that rendered the judgment did not have jurisdiction of the subject matter of the action;
 

 (b) the defendant did not receive notice of the proceedings in sufficient time to enable him to defend;
 

 (c) the judgment was obtained by fraud;
 

 (d) the cause of action on which the judgment was based, or the judgment itself, is repugnant to the public policy of the United States or of the State where recognition is sought;
 

 (e) the judgment conflicts with another final judgment that is entitled to recognition; or
 

 (0 the proceeding in the foreign country was contrary to an agreement between the parties to submit the controversy on which the judgment is based to another forum.
 

 [6]
 

 . See, e.g.,
 
 S.D. Codified Laws § l-l-25(2)(b) (permitting South Dakota courts to recognize a tribal judgment if the courts of that tribe recognize the orders and judgments of the South Dakota courts); Okla. Stat. tit. 12, § 728(B) (allowing the Supreme Court of Oklahoma to recognize tribal court judgments where the tribal courts agree to grant reciprocity of judgments); Wis. Stat. § 806.245(i)(e) (granting full faith and credit to judgments of Wisconsin Indian tribal court judgments if,
 
 inter alia,
 
 the tribe grants full faith and credit to the judgments of Wisconsin courts); Wyo. Stat. Ann. § 5—1—111 (a)(iv) (granting full faith and credit to the Eastern Shoshone and Northern Arapaho Tribes if,
 
 inter alia,
 
 the tribal court certifies that it grants full faith and credit to the orders and judgments of Wyoming).
 

 [7]
 

 . Whether a district court may, in the exercise of its discretion, reject a judgment for lack of reciprocity is a question we leave for another day. Although best left to our sister branches of government, there may be an appropriate case in which the record demonstrates significant public policy factors which might be sufficient for the district court to consider reciprocity under the “public policy” discretionary exception. Thus, we decline to endorse or preclude its discretionary consideration in a proper case.
 

 [8]
 

 . The Blaekfeet Supreme Court provides the following account of the accident: “As plaintiff began her turn off of Highway #2 onto the Whitford access road defendants' semi-truck crossed over a solid double yellow line running down the center of the highway and struck the left side of plaintiffs vehicle causing injuries to her neck and back."
 

 [9]
 

 . We rejected a similar
 
 Montana
 
 contention in
 
 Yellowstone County v. Pease,
 
 96 F.3d 1169, 1170-71 (9th Cir.1996) (holding that the Crow tribal court did not have jurisdiction to enjoin enforcement of a tax because a dispute involving one particular property owned by a tribal member was insufficient to invoke the second
 
 Montana
 
 exception).
 

 [10]
 

 . This is not only true as a general proposition, but equitable tolling would prevent the assertion of a statute of limitations defense against Wilson based on the passage of time litigating in tribal and federal court if Wilson elects to refile her complaint in state or federal court following remand.
 
 Capital Tracing, Inc. v. United States,
 
 63 F.3d 859, 863 (9th Cir.1995) (equitable tolling in federal court);
 
 Chance v. Harrison,
 
 272 Mont. 52, 899 P.2d 537, 539 (1995) (equitable tolling in Montana state courts);
 
 see also Burnett
 
 v.
 
 New York Central Railroad Co.,
 
 380 U.S. 424, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965) (holding that equitable tolling would apply to an FELA claim timely filed in the wrong venue).