# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-2277

_____

Aarin Nygaard

*Petitioner - Appellant*

Terrance Stanley

*Petitioner*
v.

Tricia Taylor; Ted Taylor, Jr.; Jessica Ducheneaux; Ed Ducheneaux; Cheyenne
River Sioux Tribal Court; Brenda D. Claymore, in her official capacity as Chief
Judge, Cheyenne River Sioux Tribal Court of Appeals

*Respondents - Appellees*

Frank Pommersheim, in his official capacity as Chief Justice

*Respondent*

The South Dakota Department of Social Services; Todd Waldo, in his official
capacity as social worker; Jenny Farlee, in her official capacity as social worker;
Cheyenne River Sioux Tribal Court of Appeals; Franklin Ducheneaux, Acting
Chief Justice of Cheyenne River Sioux Tribal Court of Appeals in his official
capacity

*Respondents - Appellees*
_____

Appeal from United States District Court
for the District of South Dakota - Central
_____

_____

Before COLLOTON, BENTON, and KELLY, Circuit Judges.
_____

KELLY, Circuit Judge.

Aarin Nygaard filed a petition for a writ of habeas corpus in the District of South Dakota challenging the Cheyenne River Sioux Tribal Court's exercise of jurisdiction in a custody matter involving his minor daughter, C.S.N. Nygaard claimed that the Tribal Court's refusal to recognize and enforce North Dakota state-court orders awarding him custody of C.S.N. violated the Parental Kidnapping Prevention Act (PKPA), 28 U.S.C. § 1738A. The district court[1] granted summary judgment to the Tribal Court after concluding that the PKPA does not apply to Indian tribes. Nygaard appeals, and we affirm.

I.

This appeal follows more than nine years of overlapping litigation in state, federal, and tribal courts. The district court deftly summarized that extensive procedural history in its order granting summary judgment to the Tribal Court respondents.[2] See Nygaard v. Taylor, 602 F. Supp. 3d 1172, 1174–84 (D.S.D. 2022). Here, we recount only those facts that are most relevant to this appeal.

_____

[1]The Honorable Roberto A. Lange, Chief Judge, United States District Court for the District of South Dakota.

[2]Among the respondents Nygaard named in the underlying habeas action were the following tribal entities and representatives: the Cheyenne River Sioux Tribal Court; the Cheyenne River Sioux Tribal Court of Appeals; the Chief Judge of the Tribal Court, in her official capacity; and the Chief Justice of the Tribal Court of Appeals, in his official capacity. The first two were dismissed from the case on

A.

C.S.N. is the daughter of Nygaard and Tricia Taylor. Taylor and C.S.N. are both enrolled members of the Cheyenne River Sioux Tribe, and Nygaard is non-Indian. C.S.N. was born in 2013 in Fargo, North Dakota, where Nygaard and Taylor resided at the time. In March 2014, Nygaard sought "primary residential responsibility" of C.S.N. in North Dakota state court, which Taylor opposed. Following mediation, the state court entered an interim order in July 2014 providing, among other things, that Nygaard and Taylor would equally share decision-making and residential responsibility for C.S.N. during the pendency of custody proceedings. The interim order also required each parent to notify the other of his or her "intent to travel out of state" with C.S.N. "at least 24 hours in advance."

On August 28, 2014, however, Taylor took C.S.N. to the Cheyenne River Indian Reservation in South Dakota without court approval and without notifying Nygaard.[3] Nygaard promptly sought relief from the North Dakota court overseeing C.S.N.'s custody proceedings, and that court issued an ex parte order on September 12 granting Nygaard temporary custody of C.S.N. and directing Taylor to "immediately return" the child to North Dakota. On October 3, the same court found Taylor in contempt for having "abscond[ed]" with C.S.N. to South Dakota and ordered that a warrant be issued for Taylor's arrest if she failed to "turn over" C.S.N. to Nygaard within five days. Taylor did not comply with that order, and a bench warrant for her arrest was issued on October 20. A state prosecutor also

sovereign immunity grounds. For brevity, we collectively refer to the remaining tribal respondents as "the Tribal Court" or "the Tribal Court respondents."

[3]Taylor also brought along her then-seven-year-old daughter, T.R.S. T.R.S.'s non-Indian father, Terrance Stanley, sought custody of T.R.S. in North Dakota state court beginning in July 2014, and those proceedings paralleled Nygaard's pursuit of custody of C.S.N. Indeed, Nygaard and Stanley were the named petitioners in the habeas action that gave rise to this appeal. But only Nygaard appeals the district court's grant of summary judgment to the Tribal Court respondents.

charged Taylor with parental kidnapping, see N.D. Cent. Code § 12.1-18-05, and an arrest warrant for that charge was issued as well.

Taylor was arrested by the FBI on November 26, 2014, at the home of her brother, Ted Taylor, Jr., on the Cheyenne River Indian Reservation. On the day of Taylor's arrest, social workers with the South Dakota Department of Social Services (DSS) placed C.S.N. in the custody of Ted Taylor, Jr. without contacting Nygaard. Taylor was transported back to North Dakota, where she remained in detention until she pleaded guilty to parental kidnapping and was sentenced to a two-year term of imprisonment.[4]

Taylor, Jr. subsequently filed a petition in the Cheyenne River Sioux Tribal Court asking that C.S.N. be placed in the temporary custody of her maternal aunt, Jessica Ducheneaux. The Tribal Court held a hearing on January 12, 2015. And in an order issued the next day, the Tribal Court determined that it had "personal and subject matter jurisdiction" over C.S.N.'s custody case under tribal law and awarded custody of C.S.N. to Ducheneaux "until further orders of the court." Nygaard did not receive notice of the January 12 hearing, and he did not learn of the Tribal Court's temporary custody order until several weeks after it was issued.

Nygaard appealed the January 13, 2015, temporary custody order to the Tribal Court of Appeals, and that appeal was followed by several years of remands, further appeals, and additional proceedings in tribal court.[5] As relevant here, Nygaard

---

[4]Taylor was sentenced in April 2015 to five years of imprisonment with three years suspended. She was released on parole in November 2015 but was immediately rearrested and placed in custody for being in contempt of several orders issued by the North Dakota court overseeing C.S.N.'s state-court custody proceedings. Taylor challenged her contempt-related detention multiple times over the ensuing months, and she remained in custody until the North Dakota Supreme Court ordered her release in September 2017.

[5]Nygaard also sought relief in federal court during this timeframe. He filed a petition for a writ of habeas corpus in the District of North Dakota in

argued that the Tribal Court custody proceedings should be dismissed for lack of jurisdiction. He contended in pertinent part that the first-in-time North Dakota court orders awarding him temporary custody of C.S.N.—which were superseded in September 2015 by a state-court judgment awarding him permanent custody—were "entitled to full faith and credit and enforcement by" the Tribal Court pursuant to the PKPA, see 28 U.S.C. § 1738A(a). The Tribal Court ultimately agreed, concluding in an April 2018 order that the Cheyenne River Sioux Tribe was bound by the PKPA under tribal law, and that the Tribal Court was therefore obligated under the statute to recognize and enforce the North Dakota custody orders. Accordingly, the Tribal Court dismissed C.S.N.'s custody proceedings for lack of jurisdiction.

Ducheneaux appealed the Tribal Court's dismissal order, and the Tribal Court of Appeals reversed on February 25, 2019. The Tribal Court of Appeals held in relevant part that the PKPA does not apply to Indian tribes as a general matter. It also held that the PKPA does not apply to the Cheyenne River Sioux Tribe as a matter of tribal law, meaning that the statute did not mandate that the Tribal Court enforce the North Dakota court orders awarding custody of C.S.N. to Nygaard. The Tribal Court of Appeals ordered that C.S.N.'s custody case be "resolved" in the Tribal Court "according to the requirements of Cheyenne River Sioux Tribal law," and that an "immediate hearing" be held on remand to determine whether the award of temporary custody of C.S.N. to Ducheneaux "continue[d]" to be in C.S.N.'s "best interests."[6]

---

November 2016, which the Tribal Court respondents moved to dismiss for lack of jurisdiction. The district court granted that motion in May 2017 after concluding that Nygaard had failed to exhaust his tribal court remedies.

[6]The Tribal Court custody proceedings have since been stayed pending resolution of the present federal habeas matter.

B.

Nygaard filed a petition for a writ of habeas corpus in the District of South Dakota in August 2019, followed by an "Amended Petition" in July 2020. See 25 U.S.C. § 1303 ("The privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe."). Nygaard sought a writ of habeas corpus "to remedy" C.S.N.'s "unlawful detention" on the Cheyenne River Indian Reservation and asked the district court "to immediately return" C.S.N. to him pursuant to the North Dakota court orders awarding him custody. As relevant here, Nygaard alleged that the Tribal Court's "assertion of jurisdiction" over C.S.N.'s custody case and its "refusal to give . . . full faith and credit" to the North Dakota custody orders amounted to a "clear violation" of the PKPA. The Tribal Court respondents moved to dismiss Nygaard's petition for lack of jurisdiction and for failure to exhaust tribal remedies, which the district court denied.

The parties then filed cross-motions for summary judgment on the "strictly . . . legal issue" of whether the PKPA applies to Indian tribes. On May 11, 2022, the district court granted summary judgment to the Tribal Court.[7] Following a thorough review of the PKPA's text, similar statutes, and relevant cases from federal, state, and tribal courts, the district court concluded that the PKPA does not extend to Indian tribes and dismissed Nygaard's habeas petition. Nygaard now appeals.

II.

The question raised in this appeal is a matter of first impression in our circuit: whether the PKPA applies to Indian tribes. The district court determined that it does not, and we review that legal conclusion de novo. See Am. Growers Ins. Co. v. Fed.

---

[7]The district court also dismissed as respondents the South Dakota DSS and the two DSS social workers who placed C.S.N. with her uncle following Taylor's November 2014 arrest. Nygaard does not challenge that decision on appeal.

Crop Ins. Corp., 532 F.3d 797, 803 (8th Cir. 2008) ("We review questions of statutory interpretation de novo."); see also Green v. Byrd, 972 F.3d 997, 1000 (8th Cir. 2020) ("We review de novo a district court's ruling on cross motions for summary judgment.").

The PKPA was enacted in 1980 to "facilitate the enforcement" of child custody orders across state lines and to "deter interstate abductions . . . of children undertaken" by parents "to obtain" a more favorable custody determination in another jurisdiction. Parental Kidnapping Prevention Act of 1980, Pub. L. No. 96-611, § 7(c), 94 Stat. 3566, 3569. The statute provides in relevant part that "[t]he appropriate authorities of every State shall enforce according to its terms . . . any custody determination . . . made consistently with the provisions of [the Act] by a court of another State." 28 U.S.C. § 1738A(a). The PKPA, in short, "extend[s] full faith and credit requirements to child custody orders," Thompson v. Thompson, 484 U.S. 174, 187 (1988), and thus "imposes a duty on states to enforce a valid child custody determination entered by a sister state," DeMent v. Oglala Sioux Tribal Ct., 874 F.2d 510, 513 n.3 (8th Cir. 1989).

A child custody order is "consistent with," and therefore enforceable under, the PKPA if (1) the issuing state court "has jurisdiction" over the subject custody proceedings under state law and (2) one of five enumerated conditions is met. 28 U.S.C. § 1738A(c). The relevant condition in this case is that the "child's home is or recently has been in the State." Thompson, 484 U.S. at 177; see 28 U.S.C. § 1738A(c)(2)(A). Once a state court enters a custody determination "consistently with" the PKPA, that state's jurisdiction over the subject custody proceedings "continues as long as . . . such State remains the residence of the child" or of any person, "including a parent or grandparent, who claims a right to custody" of the child. 28 U.S.C. § 1738A(b)(2), (d). That means, in turn, that "no other State may exercise concurrent jurisdiction over the custody dispute, even if it would have been empowered to take jurisdiction in the first instance." Thompson, 484 U.S. at 177 (citation omitted); see 28 U.S.C. § 1738A(g). And "all States must accord full faith and credit to" any "ensuing custody decree" issued by the "first State[]." Thompson,

-7-

484 U.S. at 177; see DeMent, 874 F.2d at 513 n.3 ("Once a state exercises jurisdiction over a custody dispute, no other state may exercise concurrent jurisdiction and all states must accord full faith and credit to a sister state's custody decree.").

The parties do not dispute that if Nygaard were seeking to enforce the North Dakota court orders awarding him custody of C.S.N. in another *state*, that state's courts would be obligated under the PKPA to afford the orders full faith and credit. There is also no dispute that, as a general matter, the Cheyenne River Sioux Tribal Court has the authority to make custody determinations involving minors like C.S.N. who are enrolled members of the Tribe.[8] See Ysleta Del Sur Pueblo v. Texas, 142 S. Ct. 1929, 1934 (2022) ("Native American Tribes possess inherent sovereign authority over their members and territories." (cleaned up)); United States v. Cooley, 141 S. Ct. 1638, 1642 (2021) ("Indian tribes may . . . regulate domestic affairs among tribal members . . . ."). We must determine, then, whether the PKPA requires the Tribal Court to recognize and enforce the first-in-time North Dakota custody orders to the same extent it requires state courts to do so, see 28 U.S.C. § 1738A(a), or whether, as the district court explained below, the Tribal Court may instead "exercise independent jurisdiction to reach a different result than what the North Dakota state court has ruled."

We agree with the district court that the PKPA does not apply to Indian tribes. We start with the statute's text. The PKPA provides that "[t]he appropriate authorities of every *State* shall enforce" valid custody determinations made "by a court of another *State*." 28 U.S.C. § 1738A(a) (emphasis added). "State" is defined

_____

[8]The Cheyenne River Sioux Tribe's constitution provides that the Tribal Court "shall [be] establish[ed] . . . for the adjudication of claims or disputes arising among or affecting the . . . Tribe." Under the Tribe's Children's Code, moreover, the Tribal Court has personal jurisdiction "over any child who is a member" of the Tribe "no matter where domiciled, residing or found," as well as "exclusive original jurisdiction" over proceedings "[t]o determine custody of, or to appoint a custodian or guardian for[,] a child."

in turn to "mean[] a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or a territory or possession of the United States." Id. § 1738A(b)(8). Absent from this list are Indian tribes. This is significant because "[s]pecific Indian rights"—including the Cheyenne River Sioux Tribe's inherent sovereign authority to determine custody of its minor members, see Cooley, 141 S. Ct. at 1642—"will not be deemed to have been abrogated or limited" by a federal statute "absent a 'clear and plain' congressional intent." Scalia v. Red Lake Nation Fisheries, Inc., 982 F.3d 533, 535 (8th Cir. 2020) (quoting EEOC v. Fond du Lac Heavy Equip. & Constr. Co., 986 F.2d 246, 248 (8th Cir. 1993)); see Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 790 (2014) (recognizing the "enduring principle of Indian law" that "courts will not lightly assume that Congress in fact intends to undermine Indian self-government").

Nygaard nonetheless argues that the PKPA's definition of "State" "plainly includes" Indian tribes. He does not contend that tribes are "State[s] of the United States," 28 U.S.C. § 1738A(b)(8). He instead suggests that tribes are encompassed by the PKPA's reference to "a territory . . . of the United States," id., because they are "located within" the United States' "geographic boundaries."

It is true that Indian reservations are "physically within *the* territory of the United States." United States v. Wheeler, 435 U.S. 313, 322 (1978) (emphasis added). The PKPA's definition of "State," however, includes "*a* territory . . . of the United States," 28 U.S.C. § 1738A(b)(8) (emphasis added), which is most naturally understood to mean a political entity that is not a state but is still "[a] part of the United States . . . with a separate legislature (such as Guam and the U.S. Virgin Islands)." Territory, Black's Law Dictionary (11th ed. 2019); see, e.g., 48 U.S.C. § 1541(a) ("The Virgin Islands . . . are declared an unincorporated territory of the United States of America."). And the Supreme Court has made clear that within our constitutional order, such "territories" are distinct from Indian tribes. For instance, the Court has explained that "a territorial government is entirely the creation of Congress" and thus acts "not . . . as an independent political community like a State, but as 'an agency of the federal government.'" Wheeler, 435 U.S. at 321 (quoting

Domenech v. Nat'l City Bank, 294 U.S. 199, 204–05 (1935)); see id. ("Territory and Nation[] are not two separate sovereigns to whom the citizen owes separate allegiance in any meaningful sense, but one alone."); see also Puerto Rico v. Sanchez Valle, 579 U.S. 59, 72 (2016) ("U.S. territories . . . are not sovereigns distinct from the United States."). Indian tribes, in contrast, "remain 'a separate people, with the power of regulating their internal and social relations,'" and when tribes exercise this power of self-governance, they do so "as part of [their] retained sovereignty and not as an arm of the Federal Government." Wheeler, 435 U.S. at 322, 328 (quoting United States v. Kagama, 118 U.S. 375, 381–82 (1886)). Unlike territories, moreover, tribes possess "historic sovereign authority" that predates the Constitution. Bay Mills Indian Cmty., 572 U.S. at 788.

Our conclusion that the PKPA does not apply to Indian tribes is further supported by the fact that when Congress intends for tribes to be subject to statutory full-faith-and-credit requirements, it expressly says so. The Indian Child Welfare Act (ICWA), for example—which was enacted two years before the PKPA—provides that "[t]he United States, every State, every territory or possession of the United States, and *every Indian tribe*" shall extend full faith and credit to "the public acts, records, and judicial proceedings of any Indian tribe applicable to Indian child custody proceedings." 25 U.S.C. § 1911(d) (emphasis added). The Full Faith and Credit for Child Support Orders Act of 1994 similarly provides that "[t]he appropriate authorities of each State . . . shall enforce . . . a child support order" issued "by a court of another State" and defines "State" to "mean[] a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the territories and possessions of the United States, and *Indian country*." 28 U.S.C. § 1738B(a), (b)(9) (emphasis added). And the Violence Against Women Act of 1994 states that "[a]ny protection order issued . . . by the court of one State, *Indian tribe*, or territory . . . shall be accorded full faith and credit by the court of another State, *Indian tribe*, or territory." 18 U.S.C. § 2265(a) (emphasis added).

Congress "clearly underst[ands] how to" subject Indian tribes to full-faith-and-credit provisions "when it wishe[s] to do so." Ysleta Del Sur Pueblo, 142 S. Ct.

at 1940–41. That the PKPA makes no mention of tribes is a strong indication that the statute does not apply to them. See Wilson v. Marchington, 127 F.3d 805, 809 (9th Cir. 1997) (observing that "if Congress had specifically intended to include Indian tribes under the umbrella of 28 U.S.C. § 1738," the statute implementing the Constitution's Full Faith and Credit Clause, "it could have easily done so . . . by specifically referencing them"); see also id. ("Further, the separate listing of territories, possessions and Indian tribes in [ICWA] provides an indication that Congress did not view these terms as synonymous.").

Nygaard notes that the PKPA "was enacted by Congress to prevent the very situation" he now faces—namely, one where the other parent kidnaps a child and "abscond[s] to a new jurisdiction" to avoid an unfavorable custody determination. And he suggests that excluding Indian tribes from the PKPA's ambit would undermine the statute's core purpose. "It is not our place," however, "to question whether Congress adopted the wisest or most workable policy." Ysleta Del Sur Pueblo, 142 S. Ct. at 1943. We must instead take the PKPA as it is written. See Bay Mills Indian Cmty., 572 U.S. at 794 ("This Court has no roving license, in even ordinary cases of statutory interpretation, to disregard clear language simply on the view that . . . Congress 'must have intended' something broader."). And any concerns about the statute's reach should be addressed to, and must ultimately be resolved by, Congress. See Wilson, 127 F.3d at 809 ("Certainly, there are policy reasons which could support an extension of full faith and credit to Indian tribes. Those decisions, however, are within the province of Congress . . . .").

For the reasons explained above, we conclude that the PKPA does not apply to Indian tribes. As a result, the Cheyenne River Sioux Tribal Court is not obligated under that statute to enforce the North Dakota court orders awarding custody of C.S.N. to Nygaard. The district court properly granted summary judgment to the Tribal Court.

## III.

We affirm the judgment of the district court.

_____