STATE OF NEVADA; William Molini; Nevada Division of Wildlife; Michael C. Spencer, Rich Ellington, and Bill Fitzmorris, Plaintiffs–Appellants,

v.

Floyd HICKS; Tribal Court in and for the Paiute–Shoshone Tribes; Honorable Joseph Van Walraven, Defendants–Appellees.

No. 96–17315.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 7, 1997.

Withdrawn from Submission Oct. 10, 1997.

Resubmitted Nov. 4, 1999.

Decided Nov. 9, 1999.

As Amended Jan. 24, 2000.

C. Wayne Howle, Deputy Attorney General, Carson City, Nevada, for the plaintiffs-appellants.

Melody L. McCoy, Native American Rights Fund, Boulder, Colorado, for the defendants-appellees.

Mitchell Wright, Reno, Nevada, for defendant-appellee Floyd Hicks.

Before: GOODWIN, FLETCHER and RYMER, Circuit Judges.

Opinion by Judge FLETCHER; Dissent by Judge RYMER.

FLETCHER, Circuit Judge:

This case concerns the jurisdiction of a tribal court over claims against state ·officials for tribal common law torts and federal and tribal civil rights violations. The events giving rise to these claims took place on Indian-owned land on a reservation.

The State of Nevada and named state officials appeal the decision of the district court denying them summary judgment and granting summary judgment to Floyd Hicks and the tribal court. The district court held that the tribal court had jurisdiction to hear the suit brought by Hicks against state officials for tribal common law torts and federal and tribal civil rights violations occurring on Indian-owned land. It also held that the tribal court action against the state officials in their individual capacities was not barred by sovereign immunity. It declined to review on the merits the officials' claims of qualified immunity from suit because they had not been exhausted before the tribal court. We affirm the district court's holding that the tribal court has jurisdiction, and we affirm its holding that the issue of qualified immunity was not exhausted before the tribal court and therefore was not properly before the district court or this court. We conclude the district court similarly should have refrained from addressing sovereign immunity, leaving the issue to the tribal court in the first instance.

I.

Floyd Hicks is an enrolled member of the Fallon Paiute–Shoshone Tribe ("Tribe"), a federally recognized Indian tribe with over 900 members. The Tribe's reservation in western Nevada consists of about 8,000 acres of land held by the federal government in trust for the Tribe and for individual tribal members. Hicks lives within the Tribe's reservation on allotted land held by the government in trust for him.

On August 30, 1990, Michael Spencer, a Nevada state game warden, obtained a search warrant from the New River Justice Court to search Hicks' property for evidence of the possession or killing of a big horn sheep of the California subspecies, a gross misdemeanor under Nev.Rev. Stat. § 501.376. The warrant provided, however, that the state court lacked jurisdiction over the Fallon Paiute–Shoshone reservation and that the warrant was valid only if approved by the Fallon Tribal Court.

That same day, a tribal judge approved the warrant but limited the search to the "exterior premises and any vehicles thereon." Spencer, accompanied by a tribal

police officer, allegedly executed the warrant and removed at least one mounted big horn sheep head trophy from Hicks' residence. However, the trophy was apparently of the Rocky Mountain subspecies, and it was later returned to Hicks. Hicks asserts that the trophy was damaged when returned. On June 12, 1991, Spencer applied for and received another state search warrant to seek evidence for the same state offense. Spencer, along with state game wardens Rich Ellington and Bill Fitzmorris, executed the warrant that same day, again accompanied by tribal police and with tribal court approval. One or more big horn sheep head trophies belonging to Hicks were removed. Once again, it was ultimately determined that the trophies were not evidence of any state crime or game violation and they were returned to Hicks.

Hicks filed two complaints in Fallon Tribal Court for money damages alleging damages resulting from the actions of the state and tribal officials on August 30, 1990, and June 12, 1991. The complaints named William Molini, Director of the Nevada Department of Wildlife, Michael Spencer, Rick [sic] Ellington, and Bill Fitzmorris as defendants in both their official and individual capacities, and alleged a variety of claims under the Indian Civil Rights Act ("ICRA"), 25 U.S.C. § 1302, as well as tort claims under tribal common law. By amended complaint, Hicks claimed violation of unspecified federal and tribal civil rights.[1]

The tribal court held, in a written order, that it had jurisdiction over the actions. Following a challenge to Hicks' service of process by publication, the tribal court quashed the service as ineffective. Fol-

lowing cross-appeals, the Intertribal Appellate Court reversed and remanded for trial, upholding both the service of process and the jurisdiction of the tribal court. Two weeks later, the State of Nevada and the named state officials (hereinafter "Nevada") filed the present action in federal district court against Hicks, the tribal court and tribal judge (hereinafter "tribal appellees"), for declaratory relief regarding the issue of tribal court jurisdiction.[2]

Before the district court, the parties presented cross-motions for summary judgment on whether the tribal court had jurisdiction over the claims against the state officials. Meanwhile, the tribal court granted Hicks' motions voluntarily to dismiss the claims against the state officials in their official capacity. The district court then held that the dismissal mooted the issue of tribal court jurisdiction over the state officials in their official capacities.

After oral argument and supplemental briefing, the district court issued an order denying Nevada's motion for summary judgment and granting the motion for summary judgment made by Hicks and the tribal appellees. In its order, the district court held that the Intertribal Court of Appeals did not err in holding that service of process was in accordance with tribal law.[3] The district court further held that the tribal court had subject matter jurisdiction over the claims brought by Hicks against the state officials in their individual capacities, and that the claims were not barred by sovereign immunity. Additionally, the district court held that two issues, the claims of qualified immunity by the state officials and whether any

---

1. The district court determined that "the parties have proceeded as if the federal civil rights claim alleged is a § 1983 claim for a fourth amendment violation," and assumed for the purposes of the motions before it that a § 1983 claim was alleged. The district court also assumed that the tribal civil rights claims were alleged under ICRA.

2. The Tribe waived the sovereign immunity of the Fallon Tribal Court and of the tribal

judge, Judge Van Walraven, for the limited purpose of defending against Nevada's claims in federal court. Judge Van Walraven issued orders staying each of Hicks' actions pending final resolution of the issue of tribal jurisdiction in federal court.

3. Nevada asserts before this court that it does not appeal this issue.

claims lie against William Molini, had not been exhausted in the tribal courts.

## II.

As a threshold issue, the district court correctly held that it had federal question jurisdiction to determine whether the tribal court had jurisdiction. *See* 28 U.S.C. § 1331; *see also National Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985). We review determinations of federal law regarding the extent of tribal court jurisdiction de novo. *See FMC v. Shoshone–Bannock Tribes*, 905 F.2d 1311, 1313–14 (9th Cir.1990), *cert. denied*, 499 U.S. 943, 111 S.Ct. 1404, 113 L.Ed.2d 459 (1991).

In determining the tribal court's jurisdiction, the district court first noted that no federal statutes provide guidance on the extent of tribal court jurisdiction over civil matters. The district court then adopted as basic guiding principles the distinction between civil and criminal jurisdiction, and the recognition by the courts of "a strong geographic component" distinguishing incidents occurring on Indian-owned land from those on non-Indian owned land. The district court also acknowledged the

"general proposition" of *Montana v. United States*, 450 U.S. 544, 565, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), that on non-Indian owned land "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe," [4] but doubted its applicability to the instant case after finding Hicks' allotment to be Indian-owned land.

The district court suggested instead that the applicable rule on the facts before it was that of *Williams v. Lee:* where the underlying incidents occur on Indian-owned land, tribal court jurisdiction is presumed unless affirmatively limited by an act of Congress. *See Williams v. Lee*, 358 U.S. 217, 222, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959) ("This court ha[s] consistently guarded the authority of Indian governments over their reservations.... If this power is to be taken away from them, it is for Congress to do it."). However, the district court expressed concern that the Supreme Court had not yet made clear the circumstances in which the *Montana* rule should be applied and assumed without deciding for the purposes of this case that it would apply. It ultimately concluded that, even were *Montana* to apply, the tribal court would still have jurisdiction

---

4. *Montana v. United States* involved tribal regulation of hunting and fishing by non-Indians in a river running through the reservation. 450 U.S. at 547, 101 S.Ct. 1245. As a general matter, the Court stated that "the Tribe may prohibit nonmembers from hunting and fishing on land belonging to the Tribe or held by the United States in trust for the Tribe." *Id.* at 557, 101 S.Ct. 1245. But, upon finding that the title to the river bed had passed to the State of Montana, the Supreme Court held that the tribal court lacked jurisdiction. *Id.* 566–67, 101 S.Ct. 1245.

In so ruling, the Court articulated a "general proposition" that, on non-Indian owned fee lands, "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe," with two exceptions: (1) "A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealings, contracts, leases or other arrangements"; and (2) "A tribe

may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health and welfare of the tribe." *Id.* at 565–66, 101 S.Ct. 1245. Although *Montana* involved only tribal regulation, *Strate v. A–1 Contractors*, 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997) extended *Montana*'s principles to tribal court jurisdiction as well. Examining claims that arose from an accident on a stretch of highway across tribal reservation lands, the court stressed the status of that land, which was maintained by the State of North Dakota under a federally-granted right-of-way. The federal grant meant that the land was "equivalent, for nonmember governance purposes, to alienated, non-Indian land." *Id.*, at 454, 117 S.Ct. 1404. Because of this equivalence to non-Indian owned land, the *Montana* rule applied, and the tribe lacked civil authority over the claims.

because the underlying facts fell within the exceptions to *Montana*'s general presumption against jurisdiction.

Subsequent to the district court's decision, the Supreme Court decided *Strate v. A–1 Contractors*, 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997). Nevada argues on appeal that *Strate* interprets *Montana* as precluding tribal court jurisdiction over civil actions involving non-Indians regardless of whether the underlying incidents occurred on Indian-owned land or non-Indian owned land. However, the *Strate* Court made no such determination, a fact we recently noted in *County of Lewis v. Allen*, 163 F.3d 509, 514 (9th Cir.1998).

We now affirm the district court's determination that the tribal court has jurisdiction over the actions underlying the instant case. We also affirm the district court's rulings on the issues of sovereign immunity and qualified immunity.

## A.

The Court in *Strate* held that a tribal court lacked jurisdiction to hear civil tort claims against a non-Indian brought by the widow of a tribal member, and her five adult tribal member children, for injuries occurring on a public highway maintained by the State of North Dakota under a federally granted right-of-way over tribal reservation land. 520 U.S. at 442, 117 S.Ct. 1404. In *Strate,* the Court clarified its interpretation of *Montana,* which dealt with tribal regulation of hunting and fishing in a state-owned river running through a reservation. *Strate* makes clear that the Court's holding in *Montana* is equally applicable to tribal court jurisdiction over incidents occurring on a highway running

through a reservation over which the tribe had ceded all right to control access. However, the *Strate* Court carefully expressed "no view on the governing law or proper forum when an accident occurs on a *tribal* road within a reservation." *Id.* at 442, 117 S.Ct. 1404 (emphasis added).

The Court emphasized in *Strate* that the decision in *Montana* related to "reservation land acquired in fee simple by non-Indian owners." *Id.* at 446, 117 S.Ct. 1404. By contrast, "[t]he *Montana* Court recognized that the Crow Tribe retained power to limit or forbid hunting or fishing by non-members on land still owned by or held in trust for the Tribe." *Id.* The Court also reiterated that it " 'can readily agree,' in accord with *Montana,* ... that tribes retain considerable control over non-member conduct on tribal land." *Id.* (quoting *Montana,* 450 U.S. at 557, 101 S.Ct. 1245). However, finding that the stretch of highway at issue was "align[ed] ... for the purpose at hand, with land alienated to non-Indians," the Court in *Strate* opined that the "decision in *Montana* ... governs this case," *id.* at 456, 117 S.Ct. 1404, and further decided that neither of the two *Montana* exceptions applied to the facts in that case.[5]

Again in *El Paso Natural Gas Co. v. Neztsosie,* 526 U.S. 473, 119 S.Ct. 1430, 143 L.Ed.2d 635 (1999), the Court emphasized the significance of land-ownership to the jurisdictional inquiry. That case examined the extent of the doctrine requiring tribal court exhaustion for claims arising under the Price Anderson Act. *Id.* at 1433. Members of the Navajo Nation brought suit against mining companies for injuries arising from uranium mining and processing on the Navajo Nation Reservation by

5. The first exception, the Court explained, did not apply, despite the fact that A–1 Contractors had a "consensual relationship" with the Tribe through subcontract on the reservation, because the driver of the car was not a party to the subcontract and unaffiliated with the Tribe. *Id.* at 457, 117 S.Ct. 1404. The Court also found the second exception inapplicable, stating that "[n]either regulatory nor adjudi-

catory authority over the state highway accident at issue is needed to preserve 'the right of reservation Indians to make their own laws and be ruled by them.' " *Id.* at 459, 117 S.Ct. 1404 (quoting *Williams v. Lee,* 358 U.S. 217, 220, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959)). As a result, the Court held that the tribal court lacked jurisdiction to hear the case. *Id.*

the defendants. *Id.* at 1434. The Court found for El Paso on the ground that the Price–Anderson Act preempted the injury claims, requiring that actions for liability for nuclear accidents be brought only in federal court. The Court, however, rejected the mining companies' argument that under *Strate*, a tribal court has jurisdiction over nonmembers only where the tribe has regulatory jurisdiction with respect to the matter at issue. *Id.* at 1436 n. 4. The Court found petitioners' reliance on *Strate* was misplaced, because, in contrast to the claims in *Strate*, which arose on a state highway, the events at issue in *El Paso* occurred on tribal lands. *Id.*

Our post-*Strate* opinions are consistent with evolving Supreme Court precedent that stresses membership and rights of land ownership as sources of tribal power. *See, e.g.,* William C. Canby, Jr., *American Indian Law* 72–78, 128–41 (1998); [6] Allison M. Dussias, *Geographically–Based and Membership–Based Views of Indian Tribal Sovereignty: The Supreme Court's Changing Vision,* 55 U.Pitt. L.Rev. 1 (1994). In *Wilson v. Marchington,* 127 F.3d 805 (9th Cir.1997), *cert. denied,* 523 U.S. 1074, 118 S.Ct. 1516, 140 L.Ed.2d 669 (1998), we held that a tribal court has no jurisdiction over a suit by a tribal member against a nonmember arising from an accident on a state highway that runs through the reservation. The facts of *Wilson* mirrored the facts of *Strate* almost precisely: the highway at issue in *Wilson* was a state highway constructed on a right of way granted pursuant to a federal statute with the consent of the Blackfeet Nation. *Id.* at 813–14. The general public had unrestricted access to the road, and no statute or treaty authorized the tribe to govern the conduct of nonmembers on the highway. *Id.* at 814.

In *County of Lewis v. Allen,* 163 F.3d 509, 514 (9th Cir.1998), we looked to "the landowner's right to exclude" certain nonmembers from the reservation, rather than land ownership per se, as the source of tribal power. Central to that case is a law enforcement agreement between the Nez Perce Tribe and the State of Idaho, that granted jurisdiction to the state to enforce misdemeanor laws. Acting under the authority of the agreement, a deputy county sheriff arrested a tribal member, Allen, on the reservation for disturbing the peace within the reservation. Allen brought suit in tribal court against the county and its law enforcement officers for torts arising out of the arrest. Allen's residence was on fee land not owned by the tribe or the federal government, but the record does not reflect whether the fee was owned by an Indian or non-Indian. *Id.* at 512 n. 1. The court stated that, "[f]rom the standpoint of the exercise of adjudicative authority over nonmember county law enforcement officers, it does not matter how the land was owned because the consent to criminal jurisdiction was tantamount to alienation of the land to non-Indians for th[e] limited purpose [of patrolling the reservation, investigating minor crimes and making arrests]." *Id.* at 514.

We saw the Agreement as "a significant alienation of tribal sovereignty and control." *Id.* Our analogizing to *Strate* was explicit: "Like the tribes in *Strate*, which consented to and received payment for a highway easement, the Nez Perce Tribe ceded its 'gatekeeping right,' by consenting to and receiving the benefits of state law enforcement protection." *Id.* We

---

**6.** In her dissent, Judge Rymer relies on Judge Canby's discussion of *Yellowstone County v. Pease,* 96 F.3d 1169 (9th Cir.1996) (holding that tribal court lacked jurisdiction over challenge to county taxation of fee lands within reservation) for the proposition that unless one of the *Montana* exceptions apply, tribal courts do not have jurisdiction over nonmembers. *See* dissent at 1032–34. Judge Canby's Discussion, However, Emphasizes The Fact That *Yellowstone County* was decided before the Supreme Court's decision in *Strate*, and that *Pease* involved claims against nonmembers that arose *outside* the reservation. *See, e.g.,* WILLIAM C. CANBY, JR., AMERICAN INDIAN LAW 193–195 (1998). *Pease*, therefore, is inapposite here.

found that the tribal court, having surrendered its exclusive criminal jurisdiction over Indians for minor criminal acts committed on the reservation, had surrendered its civil jurisdiction over the conduct of county officials acting pursuant to the Agreement. *Id.*

■ Finally, in *State of Montana v. King*, 191 F.3d 1108 (9th Cir. 1999), we held that an Indian tribe lacked authority to enforce its employment ordinance against a state for work done on a state owned right-of-way. Our decision in *King* is in line with the *Strate* rule: tribes lack authority to regulate, and thus power to adjudicate, activities on land alienated to non-Indians.

■ Unlike *Montana, Strate, Wilson, County of Lewis,* and *King,* the incidents underlying the instant case occurred on Indian-owned, Indian-controlled land, over which the Tribe retained its right to exclude non-members.[7] In the absence of federal statutes limiting it, the Tribe has exclusive criminal jurisdiction in Indian country over minor crimes committed by Indians. *See Ex parte Crow Dog,* 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030 (1883). State officers have no jurisdiction over such crimes. Outside of Indian country, the state has general criminal jurisdiction over all persons, including Indians, *see, e.g., Hagen v. Utah,* 510 U.S. 399, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994). Within Indian country, however, the state's jurisdiction is generally limited to those crimes that do not concern Indians or Indian interests. *See id.* Before a state official can conduct a search and seizure on the reservation to investigate a state crime, a tribal

search warrant must be issued by a judge of the tribal court. *See* Fallon Tribe Law & Order Code, Title 1 § 4–40–010, 4–40–030(a); *see also United States v. Anderson,* 857 F.Supp. 52 (D.S.D.1994) (holding that a state officer lacks power to search the reservation residence of an Indian parolee from state prison, even though the parolee consented to searches as a condition of parole).

In this case, as part of his investigation into a suspected violation of a state game law, Warden Spencer filed an affidavit of probable cause in the New River Township, County of Churchill on August 30, 1990. The state court issued a warrant that stated:

> YOU ARE HEREBY ORDERED, SUBJECT TO OBTAINING APPROVAL FROM THE FALLON TRIBAL COURT IN AND FOR THE FALLON PAIUTE–SHOSHONE TRIBES, to search the said premises....

> This Court has no jurisdiction on the Fallon Paiute–Shoshone Indian Reservation and, before any search is conducted in furtherance hereof, an approval authorizing same must be obtained from the Fallon Tribal Court in and for the Fallon Paiute–Shoshone Tribes of the Fallon, Churchill County, Nevada.

The same application and approval procedure was followed on June 12, 1991. On both occasions, Spencer was accompanied by a tribal police officer when he executed the warrant at Hicks' residence.

Unlike the Agreement in *County of Lewis,* the warrant in this case bestows no broad grant of authority upon the State of Nevada. The Tribe retained sovereignty

---

7. It is undisputed that Hicks' residence lies within the Reservation on an allotment held in trust for him by the federal government. Allotments are former tribally held lands that were divided by order of Congress in 1887 into small farm-sized tracts to be held by individuals. *See* Canby, at 270 (1988). For jurisdictional purposes, allotments are considered "Indian country." *See* 18 U.S.C. § 1151; *see also Oklahoma Tax Comm'n v. Sac and Fox Nation,* 508 U.S. 114, 123, 113

S.Ct. 1985, 124 L.Ed.2d 30 (1993) (holding that trust allotments are "Indian country" and the equivalent of tribal land for jurisdictional purposes); *DeCoteau v. District County Court,* 420 U.S. 425, 427 n. 2, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975) ("While § 1151 is concerned, on its face, only with criminal jurisdiction, the Court has recognized that it generally applies as well to questions of civil jurisdiction.").

over the land upon which the search and seizure took place. The land on which Hicks' residence stood was neither open to the public, nor controlled or maintained by any entity other than the Tribe. When the tribal court agreed to grant the state warden's request for a warrant, it was exercising its "gatekeeping right." The tribal court was free to exclude state officials engaged in law enforcement activities on the reservation. The tribal court was the sole authority to which the state warden could apply-and to which it in fact had to apply-for permission to execute a search warrant on the reservation.[8] Further underscoring the exclusivity of tribal jurisdiction is the fact that the state warden was accompanied by a tribal officer upon the execution of each warrant.

Each authorization of the execution of the warrants marked an isolated incident wherein the tribal court granted a state official permission to enter the reservation as part of a state investigation into an alleged violation of state law. There was no cession of criminal law jurisdiction, or indeed of any law enforcement jurisdiction at all. Unlike in *County of Lewis*, no benefit was conferred on the Tribe. Law enforcement on the reservation remained in the hands of the Tribe. The tribal court merely granted a state official's request to come onto the reservation for a limited, clearly delineated purpose under circumstances where all inherent jurisdictional authority lay with the Tribe. We emphasize that the tribal court modified the original search warrant by restricting the authorized search to "exterior premises only and to vehicles thereon," demonstrating that the Tribe retained authority to direct the state officers' activities on tribal land.

This case then, involves no "significant alienation of tribal sovereignty and control" over law enforcement or over Indian-owned land within the reservation. *See County of Lewis*, 163 F.3d at 514. *Cf. Strate*, 520 U.S. at 442, 117 S.Ct. 1404

(holding that the grant of the right-of-way to the state, which precluded the tribe from exercising proprietary rights of exclusion, rendered the highway the equivalent of non-Indian fee land); *Montana*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (holding that an Indian tribe had no authority to regulate hunting and fishing by non-Indians on non-Indian owned fee land within the reservation); *County of Lewis*, 163 F.3d at 514 ("[T]he consent [by the tribe] to criminal jurisdiction [of the state] was tantamount to alienation of the land to non-Indians...."); *Wilson*, 127 F.3d at 813–15 (same as *Strate*, where plaintiff was a tribal member). Instead, it concerns the effects of state officers' actions that allegedly exceeded the permission given by the Tribe in the search warrants, and alleged damages to property that possibly should not have been seized at all.

We find that the *Montana* presumption against tribal court jurisdiction does not apply in this case. Instead, in line with *Strate* and *County of Lewis*, we look to the tribe's power to exclude state officers from the land at issue. The Tribe's unfettered power to exclude state officers from its land implies its authority to regulate the behavior of non-members on that land. *See Strate*, 520 U.S. at 456, 117 S.Ct. 1404 (land treated as non-Indian fee land because Tribe "cannot assert a landowner's right to occupy and exclude"); *South Dakota v. Bourland*, 508 U.S. 679, 692, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993) ("when Congress has broadly opened up such land to non-Indians [i.e., abrogated the tribe's power to exclude], the effect ... is the destruction of *pre-existing* Indian rights to regulatory control") (emphasis added); *Brendale v. Confederated Tribes*, 492 U.S. 408, 433–448, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989) (opinion of Stevens and O'Connor, JJ.) (tribe can zone non-member fee land as long as tribe retains power to

---

**8.** In fact, the tribal court amended the state court's warrant of August 30, 1990, and re-

stricted its scope "to exterior premises only and to vehicles thereon...."

control access to the land); [9] *Confederated Salish and Kootenai Tribes v. Namen*, 665 F.2d 951 (9th Cir.1982) (tribe has power to regulate structures built by non-members which extend over the lake bed held in trust for tribe).[10]

■ Once a tribe's authority to regulate activities on its land has been demonstrated, civil jurisdiction regarding those activities follows. The Supreme Court made clear in *Strate* that "where the tribes possess authority to regulate the activities of nonmembers, '[c]ivil jurisdiction over [disputes arising out of] such activities presumptively lies' in the tribal courts.'" *Strate*, 520 U.S. at 453, 117 S.Ct. 1404. Any sovereign, even a limited sovereign, must have the power to adjudicate whatever it has the power to legislate. A sovereign who must depend on the courts of another sovereign to adjudicate violations of its own rules is little more than a landowner.

In this case, the Tribe clearly had the power to exclude state officers from its land and to regulate the behavior of state officials present on its land pursuant to limited tribal permission. There was no general cession of jurisdiction by the Tribe; instead there was a controlled, limited permission for state officials to come onto tribal land and comport themselves within to the parameters of that permission. Disputes regarding the officials' behavior under this permission are within the jurisdiction of the Tribe.

Because the tribal court has already ruled on the issue of tribal court jurisdiction, Nevada exhausted its tribal remedies on that issue. The question of tribal court jurisdiction is therefore ripe for federal review. We conclude that the tribal court has subject matter jurisdiction over the claims brought by Hicks against the state officials.[11]

### B.

■ Nevada suggests that the actions of the state officials in this case were undertaken as part of their official duties and that therefore the officials should be shielded from liability under a derivative of the doctrine of sovereign immunity. This argument concerns an affirmative defense and is not properly before the court, since the state did not exhaust its remedies regarding the sovereign immunity defense before the tribal court.[12] While the tribal

9. Though all of the land at issue in *Brendale* was non-Indian fee land, some of the land was within the "closed" portion of the reservation to which the tribe would limit access. Three justices would have found the tribe had inherent authority to zone all reservation land. Four justices would have found no authority under *Montana* to zone non-Indian fee land whether or not the tribe controlled access to the land. Justices Stevens and O'Connor, the deciding votes, held the zoning power of the tribe depends on its ability to control access to the land.

10. The Supreme Court denied certiorari in *Namen* over the dissent of Justices Rehnquist and White, who hinted that they believed the tribes had no regulatory authority over non-members even when acting on Indian land. *See* 459 U.S. 977, 978–79, 103 S.Ct. 314, 74 L.Ed.2d 291 (1982) (Rehnquist, C.J. and White, J., dissenting from denial of certiorari).

11. We note that attempting to enforce the state's criminal laws against a tribal member on the Reservation directly implicates the sovereignty of the Tribe. *See Arizona ex rel. Merrill v. Turtle*, 413 F.2d 683 (9th Cir.1969), *cert. denied*, 396 U.S. 1003, 90 S.Ct. 551, 24 L.Ed.2d 494 (1970) (holding that the arrest of a Navajo Indian on the reservation for extradition pursuant to Arizona law to another state "would clearly interfere with rights essential to the Navajo's self-government") (citing *Williams v. Lee*, 358 U.S. 217, 220, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959)); *see also Strate v. A–1 Contractors*, 520 U.S. at 459, 117 S.Ct. 1404 (1997) (recognizing an exception to the *Montana* rule "to preserve 'the right of reservation Indians to make their own laws and be ruled by them'" (quoting *Williams*, 358 U.S. at 220, 79 S.Ct. 269)).

12. Sovereign immunity has been treated by this court as an affirmative defense, "whatever its jurisdictional attributes." *ITSI TV Productions, Inc. v. Agricultural Associations*, 3 F.3d 1289, 1291 (9th Cir.1993). Thus, the defense is subject to our tribal court exhaus-

court did find that "it is not prevented by doctrines of sovereign or qualified immunity from lawfully exerting personal jurisdiction over specially appearing State defendants," this finding was clearly restricted to the issue of personal jurisdiction and did not include any findings regarding the affirmative defense of sovereign immunity. In addition, the tribal court's ruling came before Hicks voluntarily dismissed the State of Nevada and all state defendants named in their official capacities.[13] Therefore, the issue of sovereign immunity as an affirmative defense for state officials named individually in this action has not been considered on the merits by the tribal court. We therefore do not reach the issue.

■ Nevada also argues that the district court erred in holding that it was precluded by considerations of comity from ruling on the state officials' claims of qualified immunity. Nevada contends that the state officials sued by Hicks were entitled to summary judgment on the issue of tribal court jurisdiction because Hicks failed to overcome their claims of qualified immunity from suit. However, Nevada does not argue that its claim fits into any of the exceptions to the exhaustion requirement. Suggesting that no case has yet determined the existence or nature of the qualified immunity available to state officials in

tribal court, Nevada instead invites this court to define the applicable test. We decline to do so.

The Supreme Court in *Strate* reaffirmed its earlier decisions requiring, as a matter of comity and with very narrow exceptions,[14] the exhaustion of tribal remedies before the federal courts rule on the jurisdiction of the tribal courts. *See Strate*, 520 U.S. 438, at 448–454, 117 S.Ct. 1404, 137 L.Ed.2d 661 (discussing *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987), and *National Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985)); *see also Burlington Northern R. Co. v. Crow Tribal Council*, 940 F.2d 1239, 1245 (9th Cir.1991) (emphasizing the exhaustion requirement).

The district court correctly applied this exhaustion requirement to the issue of qualified immunity. *See, e.g., Stock West Corp. v. Taylor*, 964 F.2d 912, 920 (9th Cir.1992) (en banc) (holding that the district court abused its discretion in addressing a qualified immunity defense on the merits, and explaining that "[b]ecause a determination of this issue will require a careful study of the application of tribal laws, and tribal court decisions, the district court should have stayed its hand until after the Colville Tribal Courts have the opportunity to resolve the question").

---

tion rule, even though the issues the defense presents are jurisdictional in nature. Indeed, this court has held that "Eleventh Ammendment immunity __ does not implicate a federal court's jurisdiction in any ordinary sense." *Id.* Instead, this kind of immunity is raised and argued by the party seeking its benefit. Such arguments should be heard and decided in the first instance by the Tribal court.

**13.** The tribal court's ruling cited here was issued on May 5, 1993. The tribal court granted the plaintiff's motion to dismiss the State of Nevada and all state defendants named in their official capacity on October 10, 1995.

**14.** For example, the Court explained that "[w]e do not suggest that exhaustion would

be required where an assertion of tribal jurisdiction 'is motivated by a desire to harass or is conducted in bad faith' or where the action is patently violative of express jurisdictional prohibitions, or where exhaustion would be futile because of the lack of opportunity to challenge the court's jurisdiction." *National Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 856 n. 21, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985). Most recently, the Court found that the "unusual preemption provision" of the Price Anderson Act which expressed Congress' "unmistakable preference for a federal forum, at the behest of a defending party," made tribal court exhaustion of the question of tribal court jurisdiction inappropriate. *El Paso*, 526 U.S. 473, 119 S.Ct. 1430, 1437, 143 L.Ed.2d 635 (1999).

■ As a preliminary matter, we note that Nevada makes the same mistake with regard to qualified immunity that it made with sovereign immunity, by contending that it is an issue that impacts the subject matter jurisdiction of the tribal courts. The law is clear that qualified immunity, rather than serving as a jurisdictional bar, "is an affirmative defense that must be pleaded by a defendant official." *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Blatchford v. Native Village of Noatak,* 501 U.S. 775, 786 n. 4, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991) (noting qualified immunity is an affirmative defense that is "wholly distinct" from issues of jurisdiction). We reject Nevada's contention to the contrary.

■ Alternatively, Nevada argues that the issue of qualified immunity was in fact exhausted before the tribal court. To this end, Nevada quotes the ruling by the Inter–Tribal Appellate Court affirming the decision of the tribal judge that "the doctrine of . . . qualified immunity does not prevent the Fallon Tribal Court from exerting personal jurisdiction over the State Defendants," and argues that this constitutes a decision on the merits and thus satisfies the exhaustion requirement. However, this argument likewise disregards the fact that qualified immunity is an affirmative defense, and not a jurisdictional bar. A holding by the tribal court that it has jurisdiction cannot be construed as a ruling on the merits. The district court did not err in finding that the exhaustion requirement had not been satisfied.

■ Nevada also argues that, even if the issue of qualified immunity was not exhausted in the tribal courts, it should be treated as having been since Hicks had ample opportunity to respond to the claims of qualified immunity. Nevada suggests that if the tribal court record is bereft of supportive evidence for Hicks' effort to overcome the state officials' individual immunity, it is his own fault.

However, we have never required a party to anticipate another party's qualified immunity defense before the question of subject matter jurisdiction had been decided. *See, e.g., McDonald v. United States,* 102 F.3d 1009, 1011 (9th Cir.1996) (holding that "there is 'no basis for imposing on the plaintiff an obligation to anticipate such a defense'" of qualified immunity) (quoting *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980)). The argument by Nevada here again conflates the affirmative defense of qualified immunity with issues relating to the tribal courts' subject matter jurisdiction. The district court did not err in declining to reach the merits of the qualified immunity issue.

■ Lastly, Nevada argues that Hicks failed to state a claim against William Molini, Director of the Nevada Department of Wildlife, because Molini was not alleged to have participated personally in the acts of the game wardens in obtaining and executing the search warrants and seizing Hicks' property.

The district court noted that "[t]he voluntary dismissal of the official capacity claims by the tribal court may well have made personal and subject matter jurisdiction over Molini . . . inappropriate." However, since "[t]his issue was never before the tribal court because when the motion to quash rulings were made, claims against the state defendants in their official capacities had not yet been voluntarily dismissed," the district court declined to rule on whether a claim had been stated against Molini, "leaving this unexhausted issue to the tribal court." The analysis of the exhaustion requirement set out above applies with equal force here. The district court did not err.

### III.

The tribal common law torts and federal and tribal civil rights violations underlying this case occurred on Indian-owned land, the allotment on the Fallon Paiute–Shoshone Reservation held in trust by the federal government for Floyd Hicks. The tribal court has civil jurisdiction in this

case based on the Tribe's right to adjudicate disputes arising out of actions within tribal regulatory authority that take place on Indian land. The district court did not err in holding that the tribal court has jurisdiction.

Nevada's claims of sovereign and qualified immunity on behalf of the state officials and of Hicks' failure to state a claim against William Molini have not been exhausted in tribal court. Although exhaustion is not a jurisdictional prerequisite, it is required as a matter of comity. *Strate,* 520 U.S. at 453, 117 S.Ct. 1404. The district court did not err in declining to reach the merits of those claims.

AFFIRMED.

RYMER, Circuit Judge, dissenting:

I part company on subject matter jurisdiction, because I board the train from a different station. As I see it, we have to start with *Yellowstone County v. Pease,* 96 F.3d 1169 (9th Cir.1996), which applies the framework established in *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), to determine whether there is tribal jurisdiction over civil disputes involving an Indian tribe and non-Indians. Under *Montana,* the Fallon Tribal Court lacks subject matter jurisdiction over Hicks's civil actions because in *Pease* we rejected the proposition that *Montana* is limited to cases involving fee lands owned by non-Indians. As there is no consensual relationship between the Tribe and Nevada law enforcement officials, and subjecting them to suit in tribal court is not necessary to protect the tribes or their members, neither of the *Montana* exceptions to this rule is applicable. As the district court held otherwise, I would reverse.

Along with *Strate v. A-1 Contractors,* 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997), *Montana* is the leading opinion discussing tribal sovereignty over nonmembers of a tribe. In *Montana,* the Court noted that Indian tribes have lost many of the attributes of sovereignty and retain only limited powers, such as the power to punish tribal offenders, to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members. 450 U.S. at 564, 101 S.Ct. 1245. As the Court explained, the "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation," unless the non-members have entered "consensual relationships" with the tribe or its members, or the conduct of the non-Indians on fee land "threatens or has some direct effect on the political integrity, the economic security, or the health and welfare of the tribe." *Id.* at 564–66, 101 S.Ct. 1245.

*Pease* rejects the argument Hicks makes here, that *Montana* only imposes restrictions on a tribe's jurisdiction over fee lands owned by or aligned with non-Indians. In *Pease* we held that a tribal court lacked jurisdiction to entertain a civil action brought by a tribe member against Yellowstone County seeking to enjoin the County's imposition of state property taxes on his (Indian-owned) reservation property. 96 F.3d at 1173–76. Pease contended "that *Montana* does not apply to the County's action because *Montana* only imposed restriction on a tribe's jurisdiction over fee land owned by non-Indians." *Id.* at 1174. However, we were unpersuaded "because the issue presented here is whether the tribal court may assert jurisdiction over a non-Indian party (the County), and this court has called *Montana* 'the leading case on tribal civil jurisdiction over non-Indians.'" *Id.* (quoting *FMC v. Shoshone–Bannock Tribes,* 905 F.2d 1311, 1314 (9th Cir.1990)). Applying *Montana* and finding neither exception triggered, we upheld summary judgment for the County. As *Pease* is the law of this circuit, we are bound by its directive to apply *Montana* to decide "whether the tribal court may assert jurisdiction over a non-Indian party...." *Id.* at 1174. *See also* William C. Canby, Jr., American Indian Law 193 (3d ed. 1998) ("The Eighth Circuit, in the decision that the Supreme Court reviewed in *Strate,* and the Ninth

Circuit have both stated that the tribe's sovereign powers simply do not permit exercise of jurisdiction over nonmembers unless tribal interests are affected, so as to bring the exercise within one of the two *Montana* exceptions." (citing *A–1 Contractors v. Strate,* 76 F.3d 930, 939 (8th Cir. 1996) (en banc) and *Pease,* 96 F.3d at 1175–76)).

*Strate* further bolsters this view. *Strate* called *Montana* "the pathmarking case concerning tribal civil authority over non-members," and reiterated that *Montana* "establishes that, absent express authorization by federal statute or treaty, tribal jurisdiction over the conduct of nonmembers exists only in limited circumstances." 520 U.S. at 445, 117 S.Ct. 1404. Although *Strate*'s holding that a tribal court lacks jurisdiction over a tort action against a non-member who had an accident with a tribe member on a state right-of-way running through a reservation appears to turn on the fact that the accident there occurred on the state's easement (thus not on Indian land, but on land "aligned" with non-Indians), the Court unambiguously makes *Montana* the relevant law. Finally, even if *Strate* may be construed to signal that *Montana* does not apply to conduct by non-Indians on Indian land, the Court did not expressly say so and until *it* does, we must continue to follow *Pease* and apply *Montana.*

*County of Lewis v. Allen,* 163 F.3d 509 (9th Cir.1998) (en banc), also supports the conclusion that there is no tribal civil jurisdiction in this case. In *Allen,* we held that the Nez Perce tribe lacked civil jurisdiction over a member's § 1983 action (very similar to Hicks's action here) against Lewis County, the sheriff and a deputy sheriff because the tribe ceded its right "to exclude state officials engaged in law enforcement activities on the reservation." *Id.* at 514. The Nez Perce had entered into an agreement with Lewis County giving its officers the authority to enter the reservation, investigate minor crimes and make arrests. *See id.* Applying *Strate*

and *Montana,* we concluded that "it does not matter how the land was owned because the [tribe's] consent to criminal jurisdiction was tantamount to alienation of the land to non-Indians for this limited purpose." *Id.* We then determined that neither *Montana* exception properly applied to extend tribal jurisdiction over the case. *See id.* at 515–16.

In Hicks's action, Spencer, Ellington and Fitzmorris had obtained Fallon Tribal Court permission to execute the search warrant of Hicks's residence (Spencer receiving permission twice), and thus they had a right to be on the reservation that was no less absolute than Deputy Myers's right in *Allen* and the non-member defendants' in *Strate.* The fact that the Fallon Pauite–Shoshone Tribe granted permission to Nevada law enforcement personnel to come onto the reservation on a case-by-case basis instead of in a blanket agreement does not materially change the analysis. Just as the Nez Perce formally consented to Deputy Myers's presence on their reservation through a prior agreement establishing concurrent criminal jurisdiction within the reservation, *see Allen,* 163 F.3d at 514, the Fallon Pauite–Shoshone formally consented to the presence of Spencer, Ellington and Fitzmorris on their reservation through the Fallon Tribal Court's express approval of their search warrants.

So, the Fallon Tribal Court's consent to execution of the Nevada search warrants "aligned" Hicks's property, albeit temporarily, with the state of Nevada. The Tribe had surrendered its right to exclude Spencer, Ellington and Fitzmorris (at least for the time being), giving them the unqualified right to be on Hicks's property. This case is thus indistinguishable from *Allen* in all material respects. Therefore, I would apply *Montana* and *Allen* and hold that Spencer, Ellington and Fitzmorris's conduct did not imperil the tribe's power to control its internal affairs, and no applicable exception exists. Spencer only sought to execute the search warrants after obtaining the tribe's consent and assistance.

Accordingly, I would reverse and hold that the tribal court lacks subject matter

jurisdiction to entertain Hicks's civil rights actions against the Nevada officials.[1]

---

1. For this reason I do not reach the immunity issues.